UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SHARON JOHNSTON,

               Petitioner,

vs.                        Case No.  2:10-cv-180-FtM-29DNF
                            Case No.  2:07-cr-105-FTM-29DNF

UNITED STATES OF AMERICA,

               Respondent.

_____

**OPINION AND ORDER**

This matter comes before the Court on petitioner Sharon Johnston's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody (Cv. Docs. ## 1, 8; Cr. Doc. #118)[1] and supporting Memorandum of Law (Cv. Doc. #5). The United States filed a Response in Opposition to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, Pursuant to 28 U.S.C. § 2255. (Cv. Doc. #13), to which petitioner filed a Reply (Cv. Doc. #16).

**I.**

On August 21, 2007, a federal Criminal Complaint (Cr. Doc. #1) was filed against Dr. Sharon Johnston (petitioner or Dr. Johnston) alleging that between April 24 and July 10, 2007 she unlawfully

---

[1] The Court will make reference to the dockets in the instant action and in the related criminal case throughout this opinion. The Court will refer to the docket of the civil habeas case as "Cv. Doc.", and will refer to the docket of the underlying criminal case as "Cr. Doc."

dispensed Schedule II and Schedule IV controlled substances outside the scope of professional practice.  On August 29, 2007, a federal grand jury sitting in the Middle District of Florida returned a four-count Indictment (Cr. Doc. #9) against Dr. Johnston.  Each count alleged that on specific dates in June or July of 2007, petitioner unlawfully dispensed various controlled substances outside the scope of professional practice.  Petitioner was found guilty of all counts after a jury trial. (Cr. Doc. #72.)  On July 29, 2008, petitioner was sentenced to 30 months imprisonment, followed by 36 months of supervised release.  (Cr. Doc. #87.)  Petitioner's conviction and sentence were affirmed on direct appeal, United States v. Johnston, 322 F. App'x 660 (11th Cir. 2009), and a petition for writ of certiorari was denied.  Johnston v. United States, 129 S. Ct. 2783 (2009).

The matter is now before the Court on petitioner's timely § 2255 motion.  Because petitioner is proceeding pro se, her pleadings will be liberally construed by the Court. See Hughes v. Lott, 350 F.3d 1157, 1160 (11th Cir. 2003).  While petitioner is currently serving her term of supervised release, she is "in custody" for purposes of Section 2255.  United States v. Brown, 117 F.3d 471, 475 (11th Cir. 1997).

## II.

Petitioner claims her trial attorney and her appellate attorney provided ineffective assistance.  For the reasons set

2

forth below, the Court finds that petitioner was not denied her constitutional right to effective assistance by either counsel.

**A. Evidentiary Hearing**

Petitioner asserts she is entitled to an evidentiary hearing pursuant to 28 U.S.C. § 2255. (Cv. Doc. #5, pp. 54-55; Cv. Doc. #16, pp. 9-10.) The Court disagrees.

A district court shall hold an evidentiary hearing on a habeas petition "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ." 28 U.S.C. § 2255(b). "[I]f the petitioner alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim." Aron v. United States, 291 F.3d 708, 714-15 (11th Cir. 2002) (internal quotation marks and citation omitted). However, a "district court is not required to hold an evidentiary hearing where the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous." Id. at 715. See also Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008). Here, even when the facts are viewed in the light most favorable to petitioner, the record establishes that petitioner was not provided ineffective assistance of counsel in this case. Therefore, the Court finds that an evidentiary hearing is not warranted.

**B. Ineffective Assistance of Counsel Principles**

Issues of ineffective assistance of counsel can be raised in a § 2255 proceeding even where petitioner could have raised the issues on direct appeal but failed to do so. Massaro v. United States, 538 U.S. 500 (2003). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate both (1) that her counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). Generally, a court first determines whether counsel's performance fell below an objective standard of reasonableness, and then determines whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Padilla v. Kentucky, 130 S. Ct. 1473, 1482 (2010). A court need not address both prongs of the Strickland test, however, if a petitioner makes an insufficient showing as to either prong. Dingle v. Sec'y for the Dep't of Corr., 480 F.3d 1092, 1100 (11th Cir. 2007); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000).

"As to counsel's performance, 'the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.'" Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1240 (11th Cir. 2010) (quoting Bobby v. Van Hook, 130 S. Ct. 13, 17 (2009)), cert. denied, 131 S. Ct. 177 (2010). A court must

"judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).  This judicial scrutiny is highly deferential, and the court adheres to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689-90.  To be objectively unreasonable, the performance must be such that no competent counsel would have taken the action.  Hall v. Thomas, 611 F.3d 1259, 1290 (11th Cir. 2010); Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001). Additionally, an attorney is not ineffective for failing to raise or preserve a meritless issue. Ladd v. Jones, 864 F.2d 108, 109-10 (11th Cir. 1989); United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992).

To establish prejudice under Strickland, petitioner must show more than that the error had "some conceivable effect on the outcome of the proceeding." Marquard v. Sec'y for the Dep't of Corr., 429 F.3d 1278, 1305 (11th Cir. 2005) (quotation marks omitted). "Rather, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The same deficient performance and prejudice standards apply to appellate counsel. Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Roe v. Flores-Ortega, 528 U.S. at 476-77. If the Court finds there has been deficient performance, it must examine the merits of the claim omitted on appeal. If the omitted claim would have had a reasonable probability of success on appeal, then the deficient performance resulted in prejudice. Joiner v. United States, 103 F.3d 961, 963 (11th Cir. 1997). Nonmeritorious claims which are not raised on direct appeal do not constitute ineffective assistance of counsel. Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1144-45 (11th Cir. 2005).

## C. Application of Legal Principles to Claims Raised By Petitioner

The Eleventh Circuit stated the factual background and summarized the testimony at trial as follows:

> Johnston was an osteopathic physician, specializing in neurology, working in Naples, Florida. In 2007, a medical malpractice investigator with the State of Florida Department of Health received information that Johnston may have been unlawfully proscribing narcotics. She transmitted this information to Amber Baginski, a detective with the Naples Police Department that was assigned to the Drug Enforcement Administration ("DEA") as a task force officer. The DEA instituted an investigation and sent three undercover detectives into Johnston's office posing as patients. They were all instructed not to bring any medical files, prescription bottles, or "show proof that they had had any kind of medical exam or had been given any prescriptions." On the basis of the evidence gained from these visits, Johnston was indicted and tried.
>
> The three undercover detectives testified at trial. The substance of their testimony was as follows: Mark Schaible, posing as Marcus Damm, visited Johnston's

office on June 11, 2007.[N2]  Schaible complained of back
pain, told Johnston that he was injured while exercising
at the gym, and that he had pain radiating down his leg.
Schaible told Johnston that he worked in Daytona, but
when Johnston commented on the long distance he traveled
to see her, Schaible stated that he was staying with his
mother in nearby Fort Myers. Johnston told Schaible that
he had a "herniated disk back there that's causing all
the pain" and that "[s]ooner or later" he would need an
MRI, but she did not immediately recommend that he get
one done. Schaible testified that certain statements that
he made to Johnston were intended to act as "red flags,"
including: (1) he was previously a patient of Dr.
Pizarro, who was under indictment for soliciting sex in
exchange for narcotics; and (2) he had been "bumming"
medications from his friends. Johnston tested Schaible's
reflexes, had him extend his arms and touch his
fingertips, and checked his blood pressure. Johnston only
looked at Schaible's back when discussing his tattoos.
She did not otherwise touch his back, perform any other
tests, or recommend an x-ray.

N.2 Schaible recorded his conversation with Johnston and
the tape was played at trial.

Schaible informed Johnston he was taking four to five
Roxicodone tablets per day. Johnston replied, "I don't
know how much you're getting, or where you're getting it
from. Which is fine." Schaible also told Johnston that he
was taking two to three 1-milligram tablets of Xanax per
day, which Johnston noted was a lot. Johnston commented
that Schaible's blood pressure was low, attributing this
to the fact that he was probably "nice and mellow" from
the Roxicodone and Xanax. Schaible also commented, "I
always kind of wondered why you can go into a store and
buy a gallon of vodka and a carton of cigarettes, you can
have a good time, but you can't take a pain pill."
Schaible paid cash for the cost of his visit and left
Johnston's office with prescriptions for 150 15-milligram
tablets of Roxicodone and 90 1-milligram tablets of
Xanax.

Schaible had a follow-up appointment scheduled for July
9, but "to throw up another red flag" he called three
weeks after his first appointment, claiming that he ran
out of his medication, even though the prescription
should have lasted longer. The appointment was moved to
July 5. At this visit, Schaible complained that his pain

was too high, that the Roxicodone was not working, and that he had been receiving 40-milligram Methadone wafers from his friend. Johnston acknowledged that Methadone is "pretty powerful stuff" and "real hard core," and that moving from 15 to 40-milligrams is "quite a jump." Schaible explained that he took Methadone as often as six times per day, but that he only bought twenty pills off of his friend because "he needs to make some money too." Johnston did not examine Schaible at all during the visit and wrote him a prescription for 150 40-milligram Methadone wafers and refilled his Xanax prescription.

Amber Baginski, who posed as Amber Needles, was the second patient in the investigation. She testified that on June 27, 2007, she arrived at Johnston's office and noticed that several patients in the waiting room appeared to be high. Baginski was taken to an examination room, where she met Johnston.[N3]  She told Johnston that she had been a patient of Dr. Pizarro and that, due to general back pain, she had been taking 15-milligram Roxicodone tablets.[N4]  Johnston asked whether Baginski had fallen or been in an accident, and when Baginski said no, Johnston responded that most patients tell her the pain resulted from one of these incidents. Johnston checked Baginski's reflexes, blood pressure, and had her touch her fingertips, but did not examine Baginski's back or perform any other tests. As Baginski held out her hands, Johnston asked, "Doesn't the pain radiate down your legs?" Baginski believed Johnston was "telling me what I needed to say in order to obtain the pain medication." When Baginski confirmed that the pain radiated, Johnston gave her a prescription for 90 15-milligram tablets of Roxicodone. According to Baginski, the entire examination lasted less than five minutes.

N.3 Baginski carried a recorder, but the device malfunctioned and therefore no tapes were presented at trial.

N.4 Johnston did not request any of medical records, but did recommend that she get an MRI. Even though Baginski had insurance, she declined, stating that it was too expensive. Johnston did not inquire further.

Donald McDougall, who posed as Donald Nieczticz, was the final patient in the investigation. On July 10, 2007, he visited Johnston's office, where he explained to Johnston

that he had experienced pain in the past, but was not currently suffering any pain.[N5] Johnston asked if McDougall had an MRI and he told her that although he had, it did not reveal anything. McDougall told Johnston that he had a doctor near his home in the Florida Keys and that he was currently taking 20-milligram Oxycontin tablets, to which Johnston replied, "you can't take that. You're overmedicated." Nonetheless, Johnston did not follow-up about the distance McDougall traveled to see her, the name of his regular physician, or when he last had his prescription filled. As with the other patients, Johnston tested McDougall's reflexes, checked his blood pressure, and had him hold out his arms and touch his fingertips, but did no further examinations. McDougall testified that most of the fifteen-minute examination was spent discussing fishing and real estate. At the close of the visit, Johnston prescribed 90 30-milligram tablets of Roxicodone, 90 100-milligram Neurontin, and 60 pills of Flexeril.[N6]

N.5 As with Baginski, the recording device malfunctioned and therefore no tapes were presented at trial.

N.6 Neurontin and Flexeril are prescription pain killers and muscle relaxers, but are not covered by the CSA.

Johnston's office manager testified that Johnston used pre-printed examination forms to save time; Johnston would then cross out whatever information was incorrect after she examined the patient. About 99 percent of Johnston's pain management patients received controlled substance prescriptions.

The government called two expert witnesses: Dr. Richard Hood and Dr. Sherri Pinsley. Hood testified as to the high strength of the drugs prescribed by Johnston and their many potentially dangerous and deadly side effects, especially when taken together or with alcohol. He testified that a doctor should not increase from a low dose of Roxicodone to a high dose of Methadone based solely on a patients' claims that Methadone is more effective for him than Roxicodone. Instead, a doctor could confirm what drugs a patient was using by urinalysis, obtaining medical records, or obtaining past prescription bottles. Hood also explained that a patient illegally buying prescription drugs is a "red flag ... [for] diversion and addiction." Finally, Hood testified that normally if a patient complains of back pain, a

doctor should palpate the back to see if it elicits muscle spasms or tenderness.

Pinsley testified that in her pain management practice, an initial patient visit would include a head-to-toe examination, including range of motion exercises and palpating the vertebras of the spine. Pinsley testified that she would only treat a patient after obtaining the patient's medical records and, if the patient had not undergone any tests, she would require an MRI or x-ray be conducted.[N7] Pinsley said that controlled substances are always her last resort and, before prescribing controlled substances, she requires patients to take a toxicology test so that she can confirm whether they are taking any medication. She testified that Johnston's patient files were sparse, that her exams were limited, and that she was concerned that Johnston prompted patients to give certain answers about pain. She noted that she was troubled by the red flags raised by the undercover agents, including traveling a long distance to see Johnston, lack of previous medical records or tests, buying medications illegally, and requesting more medications too quickly. In her opinion, Johnston prescribed stronger medications than appropriate and acted outside the scope of professional practice.

N.7 Pinsley testified that she would sometimes give prescriptions that were of limited quantity and dosage until she could obtain the records or get tests done.

Johnston's case included testimony by her own expert, Dr. Thomas Romano. Romano was of the opinion that Johnston's conduct was professional and consistent with standards of professional care in the United States. Romano explained that there is no objective test for pain and that a doctor has to listen to a patient's report of pain and rely on her own judgment in determining whether the patient is reliable. Romano acknowledged that some of the statements made by the detectives could be red flags, but noted that there could be legitimate explanations for each that would not have prevented a doctor from treating a patient. Romano opined that Johnston acted in good faith in prescribing the medications to the three patients.

The jury ultimately convicted Johnston of all charges.

Johnston, 322 F. App'x at 662-65.

**(1) Failure to Use Documents Which Demonstrated Perjury**

Petitioner asserts perjured testimony was presented in the Complaint to the grand jury and to the petit jury, and argues that her trial attorney provided ineffective assistance by failing to seek dismissal of the charges or to impeach government witnesses based upon documents in counsel's possession which showed the perjured testimony by government witnesses and the prosecutorial misconduct in presenting the perjured testimony.  Petitioner also claims appellate counsel provided ineffective assistance by failing to raise the government's presentation of perjured testimony as an issue on appeal.  (Cv. Doc. #5, pp. 21-39; Cv. Doc. #16, pp. 2, 4-5.)

**(a)   Failure to Seek Dismissal of Complaint**

The Criminal Complaint (Cr. Doc. #1) was filed on August 21, 2007, and supported by an Affidavit of Officer Baginski.   An Indictment (Cr. Doc. #9) was filed eight (8) days later on August 29, 2007, and petitioner was arraigned the next day (Cr. Doc. #11).  The government first provided discovery to defense counsel pursuant to a Notice of Discovery Response (Cr. Doc. #15) filed on September 6, 2007.  While defense counsel did not file a motion to dismiss the Complaint, the Court finds this was well within the bounds of professional competence and did not constitute ineffective assistance of counsel.

A criminal complaint "is a written statement of the essential

11

facts constituting the offense charged." Fed. R. Crim. P. 3. If the complaint or its affidavit establishes probable cause to believe an offense has been committed and that the defendant committed it, the judicial officer "must issue" an arrest warrant or summons. Fed. R. Crim. P. 4(a). After arrest, the defendant makes an initial appearance. Fed. R. Crim. P. 5. A preliminary hearing is required unless "the defendant is indicted" before the time for the hearing. Fed. R. Crim. P. 5.1(a)(2). A felony offense requires an indictment, Fed. R. Crim. P. 7(a)(1), unless waived by defendant, Fed. R. Crim. P. 7(b). The indictment becomes the operative pleading for the remainder of the criminal proceedings. Fed. R. Crim. P. 12(a). In this case, the Indictment was filed prior to defense counsel receiving the government's transcripts which petitioner asserts reveal the perjured statements in the Complaint Affidavit, and the Indictment became the operative pleading.

The Court first looks to whether there was any perjury in the Affidavit supporting the Complaint. Petitioner asserts that Task Force Officer Amber Baginski made "numerous perjured statements in the criminal complaint" (Cv. Doc. #5, p. 21) filed in the case. Perjury is defined as testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." United States v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008). Petitioner identifies four

12

allegedly false statements in the Complaint's Affidavit concerning the first undercover visit to her office.

Petitioner first argues that the Affidavit states that petitioner "never examined" Officer Schaible's back, but the audio tape of the conversation establishes that the officer's back was examined. (Cv. Doc. #5, pp. 21-22.) The audio tape was played for the jury, and Officer Schaible testified that petitioner did not examine his back or shoulder, or examine him physically in any way (Cr. Doc. #88, p. 231[2].) Nothing in the recorded conversation refutes this testimony. At most, the audio tape and the testimony of Officer Schaible establish that petitioner looked at the tattoos on Officer Schaible's back (id., pp. 233-235), but do not establish that the back was "examined" as a medical doctor would be expected to do before prescribing pain medication. There was no reasonable basis for defense counsel to believe this statement in the Affidavit was a perjured statement.

Petitioner next asserts that the Affidavit stated that petitioner "coached" Agent Schaible as to what he needed to say to obtain medication, when the audio tape established no coaching. (Cv. Doc. #5, pp. 22-24.) This portion of the Affidavit states: "JOHNSTON coached TFO Schaible to answer her medical questions by asking him 'Doesn't it hurt to hold up your arms?' TFO Schaible

---

[2]The page numbers referenced are the page numbers located at the top, right corner of the transcript and not to the page numbers assigned by CM/ECF.

replied 'Yes, my right arm falls asleep if I hold it up too long.'
JOHNSTON further coached TFO Schaible by saying, 'Don't you have
pain radiating down your legs?' TFO Schaible replied, 'Yes, my
right leg.'" (Cr. Doc. #1, p. 4.)  The audio tape transcript
establishes that the closest statement by petitioner was "Do you
have any pain going down your leg?" (Cr. Doc. #88, p. 230.)  The
Court finds that the audio tape does not support either the
quotations attributed to petitioner or the characterization of
these statements as "coaching."

Petitioner further asserts that the Affidavit stated
petitioner had decided to write the prescription prior to leaving
the examination room to address another matter, when the audio tape
establishes the decision was not made until after petitioner
returned to the examination room.  The Affidavit states: "JOHNSTON
was called out of the room by her nurse.  Prior to leaving the
room, JOHNSTON stated, 'Wait here.  I have to answer this call and
I'll write your scripts for you.'  JOHNSTON returned and wrote out
two prescriptions." (Cr. Doc. #1, p. 4.)  The transcript of the
audio recording establishes that petitioner said she would be right
back, then stated "So you're not on Oxycontin, you're on
oxycodone", then left the examining room for about ten minutes.
(Cr. Doc. #88, p. 235.)  When petitioner returned, she took the
officer's blood pressure and then issued the prescriptions.  (Id.,
pp. 236, 238, 241.)  The Court finds that the audio tape does not

14

support the quotation attributed to petitioner.

Finally petitioner asserts that the Affidavit states petitioner told Officer Schaible he would never have to buy "them" (drugs) off the street again, when the audio tape establishes the statement was never made. The Affidavit states that when Officer Schaible told petitioner he had no documentation from his prior physician, "JOHNSTON stated 'That's ok. I'll take care of you. You will never have to buy them off the street again." (Cr. Doc. #1, p. 4.) The Court has not found, and the government has not identified, any portion of the audio's transcript which contains such a statement.

The Court assumes for purposes of this § 2255 motion that the last three statements challenged by petitioner were not true, and that there were made by the affiant with at least reckless disregard of the truth[3]. The remedy would be to redact those false statements and determine if probable cause still existed in the Affidavit. Franks v. Delaware, 438 U.S. 154, 171-72 (1978); United

---

[3]A law enforcement officer recklessly disregards the truth when she "should have recognized the error [in the warrant application], or at least harbored serious doubts" as to the facts contained therein. United States v. Kirk, 781 F.2d 1498, 1503 (11th Cir. 1986). The information in the Affidavit came from Officer Schaible's written report, and at trial Officer Schaible testified to various inaccuracies in the report. There is no evidence that Officer Baginski was aware or should have been award of the inaccuracies at the time she filed the Complaint. Nonetheless, for purposes of the § 2255 motion, that Court assumes reckless disregard.

States v. Martin, 615 F.2d 318, 327-29 (5th Cir. 1980)[4] (applying rule regarding false statements in a search warrant in Franks v. Delaware to perjurious statements used to obtain an arrest warrant); United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).   Probable cause exists if an arrest is objectively reasonable based on the totality of the circumstances. Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (internal quotation marks and citations omitted).

Even when redacted, the Complaint's Affidavit easily establishes probable cause to believe both that a federal criminal offense had been committed and that petitioner was the person who committed it.   The Affidavit still correctly provides that petitioner wrote two prescriptions without examining the patient's back on June 11, 2007, and the accuracy of the factual statements concerning the June 27, 2007, July 5, 2007, and July 10, 2007, office visits is not challenged.   The Court finds that the audio

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

transcripts did not establish a basis for a reasonably competent counsel to have believed there was a basis to seek dismissal of the Complaint or to challenge the probable cause in the Affidavit. Additionally, because the Affidavit still established probable cause to arrest, petitioner has suffered no prejudice in the failure to file such a motion.

    **(b)**   **Presentation of Perjury to Grand Jury**

Petitioner asserts that Agent McDougall falsely told the grand jury (1) that petitioner stated her patient Officer Schaible would never have to buy "drugs" off the street again, when audio tapes establish the statement was never made, (2) that Officer Schaible made only generalized complaints of pain in his lower back, when audio tapes establish Officer Schaible complained in detail of extreme pain, and (3) that petitioner never examined Officer Schaible's back, when the audio tape establishes otherwise. Petitioner further asserts that the solicitation of this perjured testimony from Agent McDougall violated <u>Giglio v. United States</u>, 405 U.S. 150 (1972). (Cv. Doc. #5, pp. 28-32.)

As the Court has found above, there is no evidence on the audio tape to support the testimony that petitioner stated Officer Schaible would never have to buy "them" or "drugs" off the street again. The Court concludes that Agent McDougall's testimony was accurate when he stated that Officer Schaible made only generalized complaints of pain. (Cr. Doc. #88, pp. 230-231.) Additionally, as

17

discussed above, the audio recording establishes that petitioner examined the tattoos on Officer Schaible's back, not the back itself in a manner consistent with the determination of the need for prescribed medication.   Thus, only one of the challenged statements to the grand jury was not supported by the audio recordings.

As the Eleventh Circuit recently summarized in <u>Akel</u>:

> [T]he possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct. [ ] To make out a claim of prosecutorial misconduct regarding the use of false testimony, a defendant must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. [ ] Perjury is defined as testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory. [ ] Conviction beyond a reasonable doubt without the use of the tainted testimony or alleged misconduct at trial makes it highly improbable that the grand jury indictment was based on insufficient probable cause.

<u>United States v. Akel</u>, 337 F. App'x 843, 858 (11th Cir. 2009) (internal citations and quotation marks omitted).   However, "dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." <u>United States v. Accetturo</u>, 858 F.2d 679, 681 (11th Cir. 1988)(quotation marks and citations omitted).   Even if an error occurs before a grand jury, it will not be cause to question an indictment unless the error "substantially influenced" the grand jury's decision to

18

issue charges, or if grave doubt existed that the decision was free from such influence. <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 263 (1988).

The Court finds there was no perjury before the grand jury and no prejudice to petitioner. There is no evidence that Agent McDougall knew the statement contained in Officer Schaible's report and attributed to petitioner was inaccurate, and the transcripts of the recording were not available at the time of his testimony. Additionally, there is no showing that the false statement substantially influenced the grand jury's decision to issue the charges or that there is grave doubt that the decision was free from the influence of the single false statement, given the other evidence.

Petitioner also argues that the government knowingly solicited perjured testimony in order to obtain her indictment, in violation of <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972). A conviction obtained by the knowing use of false or perjured testimony, including testimony that reflects on the credibility of the witness, will "be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985). "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was

false testimony, and that the falsehood was material." <u>United</u>
<u>States v. McNair</u>, 605 F.3d 1152, 1208 (11th Cir. 2010)(citations
omitted).

As discussed above, only one statement to the grand jury was
unsupported by the audio recording, and the other evidence
presented to the grand jury was ample to find probable cause for
the indictment.  There is no showing that the prosecutor knew or
should have known the statement was not supported by the audio
recording, or that the prosecutor intentionally elicited perjured
testimony.  The Court finds no basis to dismiss the indictment, and
concludes that petitioner's attorney did not provide ineffective
assistance by failing to file a motion to dismiss based on
prosecutorial misconduct.

**(c)  Presentation of Perjury at Trial**

Petitioner asserts that Investigator Susan Johnston falsely
told the trial jury that her investigation established probable
cause of criminal activity by petitioner, which was found by a
panel of doctors and civilians and resulted in her contacting Agent
Baginski, when the DEA-6 showed that this was not the way the
investigation was initiated.  (Cv. Doc. 5, pp. 33-39; Cv. Doc. #16,
pp. 2, 4-5.)  Petitioner misreads the record as to the evidence
presented to the jury.

The government's opening statement included the following:

> How does this investigation begin? Susan Johnson is
> a medical investigator, for the Department of Health, who

20

investigates different areas of medicine, and also
investigates the inappropriate prescribing of narcotics.
She receives information and concerns about Dr. Johnston,
the defendant here, from law enforcement agencies and
from other complaining citizens.

She passes that information along to the Drug
Enforcement Administration as part of her job, as part of
the procedure. And the agent who handles these cases, she
passes them along to that agent. That agent is Agent
Amber Baginski. [ ]

Around the same time, DEA Agent Don McDougall was
working on different cases, and he also hears that same
information regarding concerns, information regarding
Dr. Johnston, from confidential sources in the jail. So,
this information is coming from different sources.

The drug enforcement administration begins its
investigation, and it formulates a plan to either prove
or disprove these allegations that Dr. Johnston was
prescribing so many prescriptions of these powerful
narcotics that she was now outside the scope of medical
practice. Now not prescribing for any legitimate reason,
and thus committing a crime.

(Cr. Doc. #88, pp. 131-32.)

Susan Johnston was the first government witness, and testified

she was a medical malpractice investigator for the State of Florida

Department of Health.  Ms. Johnston testified to the general

process for the administrative investigations she performs for

various health professionals, and explained that if she receives

information she believes should go to law enforcement she is

required to report that information to law enforcement.  Ms.

Johnston testified that she received "information and concerns"

about petitioner, which she reported to Officer Baginski with the

Drug Enforcement Administration (DEA).  The content of the

"information and concerns" was not elicited before the jury, either through Ms. Johnston or other witnesses or exhibits. Ms. Johnston testified she did not make a determination about whether the information was true, but she simply referred it to DEA to be investigated. She further testified that her jurisdiction is limited to civil or administrative matters that deal with quality of care. (Cr. Doc. #88, pp. 156-169.) Nothing in Ms. Johnston's testimony suggested she had established probable cause of criminal activity by petitioner, or that probable cause had been found by a panel of doctors and civilians.

There was noting in this testimony for defense counsel to impeach, and no perjury. There is nothing inconsistent about law enforcement getting information from <u>both</u> a Crime-Stoppers call and from administrative sources, and no reason for defense counsel to elicit such information in front of the jury. The content of the information was not elicited, which was certainly in the best interest of petitioner. The Court finds no perjury and no ineffective assistance of counsel.

**(d)   <u>Giglio</u> Violation**

Petitioner also argues that the government knowingly solicited perjured testimony at trial in order to obtain her conviction, in violation of <u>Giglio</u>, which should have been raised as an issue on appeal. The record does not support this position. There was simply no perjury solicited by prosecutor as to the beginning of

22

the investigation, and any possible inconsistency was certainly not material to the issue of petitioner's guilt or innocence on the charges actually brought in the Indictment.

**(e)   Failure to Impeach Witnesses**

Petitioner also states, in a conclusory fashion, that her trial attorney provided ineffective assistance by failing to cross-examine the government witnesses on their statements in the Complaint Affidavit. Only Officer Baginski made statements in the Affidavit, since she was the only affiant. Defense counsel cross-examined Officer Baginski by focusing on the admitted lies she told to petitioner while acting in an undercover capacity (Cr. Doc. #88, pp. 192-94), and as to what petitioner did during the examination (id., pp. 194-200). Counsel also cross-examined Officer Baginski regarding the malfunctioning of the recording device and lack of a recording for her visit (id., pp. 200-203), and the legality of the drugs prescribed (id., p. 203). Defense counsel specifically cross-examined Officer Baginski concerning her statement that petitioner said "Doesn't the pain radiate down the back of you legs?" during Officer Baginski's undercover visit, when there was no recording of that conversation (id., pp. 204-205). Defense counsel also impeached Officer Baginski using her Affidavit (id., pp. 206-209), and elicited exculpatory statements made by petitioner (id., pp. 209-210).

Defense counsel also spent much of his cross-examination of

Officer Schaible discussing inaccuracies in his report of the June 11, 2007 conversation with petitioner and portions of the alleged conversations not being in the transcript.  (Cr. Doc. #89, pp. 302-305, 316-217, 324, 331-332.)  Indeed, defense counsel specifically cross-examined Officer Schaible about the quotation in his report about never having to buy drugs off the street (id., pp. 306-307, 311-313), and inconsistencies in his report as to the chronology of the events during his meeting with petitioner (id., pp. 308-309).

The Court finds that counsel's cross-examination was well within the bounds of competency, and that there was no ineffective assistance based upon the cross-examination of the government witnesses.

**(f)   Appellate Counsel**

Petitioner argues that appellate counsel provided ineffective assistance of counsel by failing to argue the government's <u>Giglio</u> violation as an issue on appeal.  There was no <u>Giglio</u> violation, and no reasonable appellate attorney would have asserted such a claim.  The Court concludes that petitioner's appellate counsel did not provide ineffective assistance.

**(2) Failure to Call Defense Witnesses**

Petitioner argues that her trial attorney provided ineffective assistance of counsel by failing to call prepared defense witnesses who were willing to testify.  These witnesses were two retired law enforcement officers who had been treated by petitioner and would

24

testify as to the high quality of care they had received. Petitioner asserts that her attorney had interviewed these witnesses and prepared them to testify at trial, but did not call them at trial. Petitioner further asserts that her attorney did so, without her permission, because of a "deal" he made with the prosecutor, who had threatened to call other patients whose testimony would not be exculpatory if petitioner called her witnesses. (Cv. Doc. #5, pp. 40-42, Cv. Doc. #5-7; Cv. Doc. #16, pp. 5-6.)

The Court assumes that the factual representations in the Affidavit (Cv. Doc. #5-7) are accurate. As the Eleventh Circuit recently stated,

> "[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision" that will seldom, if ever, serve as grounds to find counsel constitutionally ineffective. Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004). To show that counsel's conduct was unreasonable, defendant must demonstrate that no competent counsel would have taken the action that his counsel did take. Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

Miranda v. United States, 433 F. App'x 866, 869 (11th Cir. 2011). Assuming that the testimony of other patients would have been admissible, it would have opened the door to yet other patients who the government was prepared to call and elicit inculpatory evidence. A reasonable attorney would have concluded that the

trade-off with the government was beneficial to the client.  The two defense witnesses knew nothing about the specific charges, which related to other patients, and calling them created the strong risk of eliciting inculpatory evidence which otherwise would not be introduced.  Any competent attorney would have made the same decision, and no ineffective assistance has been established.

### (3)  Introduction of Damaging Statements

Petitioner argues that her trial attorney provided ineffective assistance by introducing damaging inculpatory statements before the jury that petitioner never stated at any time.  Petitioner asserts that her attorney twice elicited on cross-examination of Officer Schaible that petitioner had made the comment that "you will never have to buy them," referring to drugs, "off the street again."  Petitioner denies making such a statement, and asserts the recordings confirm the statement was not made during her examination of Officer Schaible.  (Cv. Doc. #5, pp. 43-46; Doc. #16, pp. 6-7.)  Reading the cross-examination of Officer Schaible in its entirety, it is clear that defense counsel was impeaching the officer by reading statements from the officer's report which were inaccurate or not in the audio transcript.  (Cr. Doc. #89, pp. 305-307, 308-309.)  There was no ineffective assistance of counsel.

### (4)  Failure to Raise Confrontation Issue on Appeal

Petitioner argues that her appellate attorney provided ineffective assistance of counsel by failing to raise a <u>Crawford v.</u>

Washington, 541 U.S. 36 (2004) violation as an issue on direct appeal. Petitioner asserts that Investigator Johnson testified that her investigation resulted in a "complaint" being forwarded to the DEA for a follow-up investigation. The government asserted, however, that Investigator Johnson's written report was confidential, which precluded defense counsel from being able to cross-examine the investigator as to the nature and contents of the complaint or the merits of Investigator Johnson's investigation. Petitioner argues that the failure to allow defense counsel to delve into the contents of the complaint and elaborate on its faults violated petitioner's Sixth Amendment confrontation rights under Crawford and should have been raised on appeal. (Cv. Doc. #5, pp. 47-52; Cv. Doc. #16, pp. 7-9.)

Crawford, of course, has nothing to do with the issue raised in this case, having involved the converse of this situation. In Crawford, the issue was whether the document was admissible without live testimony; here, there was live testimony but the underlying report was not introduced. No competent appellate counsel would have raised a Crawford issue, or any other issue, related to the testimony of Susan Johnston.

**(5)  Cumulative Impact of Trial Counsel Errors**

Petitioner argues that the cumulative impact of the errors by trial counsel deprived her of the effective assistance of counsel. (Cv. Doc. #5, p. 53.)  Because petitioner fails to identify any

27

instance of ineffective assistance of counsel, there can be no cumulative error. <u>United States v. Waldon</u>, 363 F.3d 1103, 1110 (11th Cir. 2004).

Accordingly, it is now

**ORDERED:**

1. Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody (Cv. Docs. #1; Cr. Doc. #118) is **DENIED** as to all claims for the reasons set forth above.

2. The Clerk of the Court shall enter judgement accordingly, terminate any pending motions, and close the civil file.  The Clerk is further directed to place a copy of the civil judgment in the criminal file.

**IT IS FURTHER ORDERED:**

**A CERTIFICATE OF APPEALABILITY (COA) AND LEAVE TO APPEAL *IN FORMA PAUPERIS* ARE DENIED.**  A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1); <u>Harbison v. Bell</u>, 556 U.S. 180 (2009).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004)

28

or, that "the issues presented were adequate to deserve encouragement to proceed further," Miller-El v. Cockrell, 537 U.S. 322, 336 (2003)(citations and internal quotation marks omitted). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** at Fort Myers, Florida, this __26th__ day of November, 2012.

JOHN E. STEELE
United States District Judge


Copies:
Petitioner
Counsel of Record